IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

BRUCE CAMPBELL GOWANS, JR.,

    Plaintiff,

v.                                            CIVIL ACTION NO. 5:20-cv-00295

ANDREW SAUL,
Commissioner of Social Security,

    Defendant.

**PROPOSED FINDINGS & RECOMMENDATION**

Plaintiff Bruce Campbell Gowans, Jr. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on April 28, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Brief in Support of Complaint and Motion for Remand (ECF No. 15) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 16).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 15), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I. BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 45 years old at the time of his alleged disability onset date and 51 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 252.)[1] He is a high school graduate. (*Id.* at 244.) Most recently, he worked at a fast-food restaurant, and he has also been employed as an electronics technician and a landscaper. (*Id.*) Claimant alleges that he became disabled on December 20, 2016,[2] due to epilepsy and depression. (*Id.* at 78, 243.)

Claimant protectively filed his application for benefits on June 27, 2017. (*Id.* at 223–30.) His claim was initially denied on August 16, 2017, and again upon reconsideration on November 1, 2017. (*Id.* at 150–54, 160–66.) Thereafter, on December 12, 2017, Claimant filed a written request for hearing. (*Id.* at 167–69.) An administrative hearing was held before an ALJ on January 23, 2019, in Roanoke, Virginia. (*Id.* at 73–99.) On April 1, 2019, the ALJ rendered an unfavorable decision. (*Id.* at 28–48.) Claimant then sought review of the ALJ's decision by the Appeals Council on May 24, 2019. (*Id.* at 219–22.) The Appeals Council denied Claimant's request for review on March 3, 2020, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–7.)

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 13.
[2] Claimant initially gave October 8, 2012, as his alleged onset date, but he later moved to amend it to December 20, 2016, the day after the date of the unfavorable decision on his first claim for benefits. (Tr. at 78, 243.)

2

Claimant timely brought the present action on April 27, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) The Commissioner filed an Answer (ECF No. 12) and a transcript of the administrative proceedings (ECF No. 13). Claimant subsequently filed his Brief in Support of Complaint and Motion for Remand (ECF No. 15), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 16). As such, this matter is fully briefed and ready for resolution.

B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the presiding District Judge.

1. *Treatment for Epilepsy*

On February 24, 2016, Claimant presented to his primary care physician for a regular appointment regarding his seizure disorder. (*Id.* at 339.) He also requested a neurology referral. (*Id.*) Claimant reported experiencing unsteady gait, lack of coordination, mood swings, cognitive change, and grand mal seizures. (*Id.*) A physical examination was largely unremarkable. (*Id.* at 339–40.) Claimant's physician decreased his prescribed dosage of his seizure medication and referred him to a neurologist. (*Id.* at 340.)

Several months later, on July 3, 2016, Claimant presented to the emergency room at a local hospital after having a seizure. (*Id.* at 381.) A physical examination was normal. (*Id.* at 382–83.) However, imaging of Claimant's head revealed a "mildly dilated 4th ventricle," and a brain scan was recommended. (*Id.* at 387.) Claimant was given an extra dosage of his prescribed seizure medication and directed to follow up with his primary

3

care physician. (*Id.* at 384.) He was discharged home in stable condition. (*Id.* at 386.) Claimant presented to his primary care physician on July 13, 2016, reporting that he "had [a] seizure last week" for the first time in two years. (*Id.* at 334.) He stated that he "has been taking [his] medications" and was "tolerating them," but he "may have [been] sleep deprived last week." (*Id.*) He denied any symptoms aside from seizures and depression. (*Id.*) A physical examination was normal. (*Id.* at 334–35.) Claimant was prescribed an additional seizure medication and again referred to a neurologist. (*Id.* at 335.) He underwent a brain scan, which revealed "chronic changes," on August 1, 2016. (*Id.* at 348–49 (emphasis deleted).) On September 13, 2016, he returned to his primary care physician and reported that he "[h]as had 5 seizures in the last month," including one that morning. (*Id.* at 331.) Claimant stated that he was "tolerating all [his] meds" and again denied any symptoms aside from seizures and depression. (*Id.*) A physical examination was normal. (*Id.* at 331–32.) Claimant was instructed to continue his medications. (*Id.* at 332.)

He presented to his neurologist for the first time on October 6, 2016, and explained that he had suffered from seizures since he was four years old and that his childhood seizures were "well controlled" on medication. (*Id.* at 361.) He also stated that he had stopped using seizure medication upon turning eighteen and had "occasional seizures after he stopped taking his medicine." (*Id.*) Claimant reported that he had restarted his seizure medications in the summer of 2015 but had suffered "5-6 seizures [since then], which is more than he was having off of the medications." (*Id.*) He related that his most recent seizure was in August 2016 and that his seizures lasted approximately a minute and usually caused stiffening but not loss of consciousness. (*Id.*) Claimant stated that "his seizures are triggered by having to get a blood draws [sic], talking about

4

intense/gorey [sic] medical procedures, and when given intravenous contrast" but not by "strong emotions and bad news." (*Id.*)  He also stated that his medications "make him very sleepy during the day and can upset his balance." (*Id.*)  A physical examination was unremarkable. (*Id.* at 361–62.)  The neurologist ordered a brain scan and other testing and discussed changing Claimant's medications. (*Id.* at 362.)  Claimant returned to his neurologist on November 1, 2016, and reported that he had not had a seizure since his last appointment. (*Id.* at 364.)  He stated that he was compliant with his medications and that they caused no side effects. (*Id.*)  A physical examination was normal. (*Id.* at 364–65.)  An electroencephalogram performed that day was also normal. (*Id.* at 366.)  The neurologist changed one of Claimant's medications at his request. (*Id.* at 365.)

When Claimant next presented to his neurologist on March 1, 2017, he reported that he had "one breakthrough seizure" on December 10, 2016. (*Id.* at 367.)  He stated that he was "tolerating [his medication change] without side effects." (*Id.*)  A physical examination was normal, except the neurologist observed that Claimant was using a cane to walk. (*Id.* at 367–68.)  He increased the dosage of Claimant's seizure medication from 2,000 milligrams per day to 2,500 milligrams per day. (*Id.* at 368.)  Several weeks later, on March 28, 2017, Claimant presented to his primary care physician and told him that he had not had a seizure since December and "is tolerating the medicines." (*Id.* at 328.)  He also reported that his neurologist had increased the dosage of one of his medications by 500 milligrams a day and that "he is tolerating that dose change well." (*Id.*)  A physical examination was unremarkable aside from tenderness in Claimant's lumbar spine and limited flexion range of motion. (*Id.* at 328–29.)  Claimant was instructed to continue his medications. (*Id.* at 329.)

At his next appointment with his neurologist on May 2, 2017, Claimant denied any seizures since December 10, 2016, but he reported "memory issues," which he described as "he knows what he wants to say, but has trouble with word searching." (*Id.* at 498.) A physical examination was normal. (*Id.* at 499.) Claimant's neurologist noted that his epilepsy was "controlled." (*Id.* at 500.) On May 10, 2017, the neurologist increased Claimant's dosage of one of his medications. (*Id.* at 501.) Claimant returned to his neurologist on August 9, 2017, and reported "that he hasn't had a seizure in over two months." (*Id.* at 448.) A physical examination was normal. (*Id.* at 448–49.) He was directed to continue using his medications as prescribed. (*Id.* at 450.)

Nearly two months later, on September 28, 2017, Claimant presented to his primary care physician and stated that he "is tolerating his meds well." (*Id.* at 460.) A physical examination was largely unremarkable. (*Id.* at 460–61.) He was instructed to continue his medications. (*Id.* at 461.)

On December 29, 2017, Claimant presented to his neurologist and reported that he had not had a seizure since June 2017, was compliant with his medications, and was not experiencing side effects. (*Id.* at 506.) A physical examination was normal. (*Id.* at 507.) The neurologist noted that Claimant's epilepsy and seizures were "controlled." (*Id.* at 508.)

At his next appointment with his neurologist on April 27, 2018, Claimant related that he had a seizure about a month prior, on March 28, 2018, during which he lost consciousness and woke up in the floor during the night. (*Id.* at 519.) Claimant reported that he was compliant with his medications and did not have side effects. (*Id.*) A physical examination was normal. (*Id.* at 520.) The dosage of one of Claimant's medications was increased to 3,000 milligrams per day. (*Id.* at 521.) On May 29, 2018, Claimant returned

to his neurologist and complained that the increased dosage caused irritability but reported that he had not had a seizure since his last visit. (*Id.* at 516.) A physical examination was normal. (*Id.* at 517.) Claimant was instructed to reduce his dosage back to 2,500 milligrams per day. (*Id.*) When he presented to his neurologist on September 26, 2018, Claimant stated that he was "doing much better" since the dosage was decreased and was not experiencing any side effects. (*Id.* at 513.) He related that he had not had any more seizures. (*Id.*) A physical examination was normal. (*Id.* at 514.) Claimant's neurologist instructed him to continue his medications as prescribed and noted that his epilepsy was "[w]ell controlled." (*Id.* at 514–15.)

Claimant presented to his neurologist on February 6, 2019, and again reported that his last seizure occurred on March 28, 2018. (*Id.* at 509.) He stated that he was compliant with his medications and "does fine [with his] current dose" of medication. (*Id.*) A physical examination was normal. (*Id.* at 509–10.) Claimant was directed to continue his medications as prescribed, and his neurologist noted once more that his epilepsy was "[w]ell controlled." (*Id.* at 510.)

    2. *Vocational Expert Testimony*

The ALJ began his questioning of the vocational expert ("VE") by asking her to classify Claimant's past relevant work. (*Id.* at 91.) She stated that Claimant previously worked as a landscape laborer, an unskilled job that was categorized at the heavy exertional level but Claimant performed it at the medium exertional level. (*Id.* at 91–92.)

The ALJ then asked the VE to imagine a hypothetical individual with Claimant's age, education, and work experience who could lift and carry twenty pounds frequently and ten pounds occasionally; could sit, stand, and walk for six hours in an eight-hour workday; could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and

crawl but never climb ladders, ropes, or scaffolds; could not work at unprotected heights or around hazardous machinery and could not operate a motor vehicle; could have occasional exposure to humidity, wetness, dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat, and vibration; and "could work in loud noise." (*Id.* at 92.) The VE testified that such an individual could not perform Claimant's past work, but he could work as an assembler, with 38,000 positions nationally and 1,000 in Virginia; a packing line worker, with 36,000 positions nationally and 900 in Virginia; or a garment folder, with 34,000 positions nationally and 1,100 in Virginia. (*Id.* at 92–93.)

      Next, the ALJ asked the VE to imagine a second hypothetical individual who was limited in the same ways as the first, except he would also be off task for 5% of the workday in addition to normal breaks and would miss one day of work per month. (*Id.* at 93.) The VE testified that the second hypothetical individual could not perform Claimant's past work but could perform the same three jobs she identified for the first hypothetical individual. (*Id.*)

      In his third hypothetical to the VE, the ALJ asked her to expand the individual's time off task to 15% in addition to normal breaks and his absences to two per month. (*Id.* at 93–94.) The VE testified that the third hypothetical individual could not perform Claimant's past work or any work competitively. (*Id.* at 94.)

      Finally, the ALJ asked the VE to imagine a fourth hypothetical individual who was limited in the same manner as the first hypothetical individual, except he was restricted to sedentary work. (*Id.*) The VE testified that the fourth hypothetical individual could not perform Claimant's past work and that he would have "no transferable skills." (*Id.*)

      Claimant's attorney then asked the VE whether a packing line worker worked on a production line. (*Id.*) The VE responded that all three of the positions she identified

required production-line work. (*Id.*) Claimant's attorney asked, "[I]s pace important? In other words, if they can't keep up the pace, could they do it?" (*Id.* at 95.) The VE replied that an individual who could not work at a production-rate pace could not perform any of the jobs she identified. (*Id.*)

C.  *Sequential Evaluation Process*

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii),

9

416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In

determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

11

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a [VE] responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant had not engaged in substantial gainful activity since the date of his application for SSI benefits. (Tr. at 33.) He found that Claimant's epilepsy constituted a "severe" impairment. (*Id.* at 33–36.) However, he determined that none of Claimant's impairments, or a combination thereof, met or medically equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 36.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able to perform light work, except he can lift, carry, push, and pull twenty pounds occasionally and ten pounds frequently; sit, stand, or walk for six hours in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. (*Id.*) He found that Claimant "can never work at unprotected heights, around hazardous machinery, around moving mechanical parts, or with required driving of an automobile" but "can perform work with occasional exposure to humidity, wetness, dust,

12

odors, fumes, pulmonary irritants, extreme hot and cold temperatures, noise, and vibrations." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, he was unable to perform his past relevant work. (*Id.* at 42.) He noted that Claimant is "closely approaching advanced age" with "at least a high school education" and that "[t]ransferability of job skills [was] not material to the determination of disability." (*Id.*) Because the ALJ determined that Claimant was unable to perform the full range of light work, he enlisted a VE to aid in his finding that Claimant is capable of working as an assembler, packing line worker, or garment folder. (*Id.* at 42–43.) As a result, the ALJ concluded that Claimant was not "under a disability . . . since June 27, 2017, the date the [SSI] application was filed." (*Id.* at 43.)

## II.   LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that

of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III. ANALYSIS

Claimant argues that the ALJ erred by not asking the VE whether her testimony was consistent with the *Dictionary of Occupational Titles* and asserts that he cannot perform the jobs she testified were available to a hypothetical individual with his RFC. (ECF No. 15 at 2–5.) He further contends that the ALJ failed to account for the side effects associated with an increased dosage of his seizure medication and improperly discounted the impact of those side effects when weighing an ALJ's unfavorable decision on a prior claim. (*Id.* at 5–8.) Claimant asks this Court to reverse the Commissioner's decision and remand this matter to the ALJ. (*Id.* at 8.) The Commissioner responds that none of the three jobs the VE identified requires exposure to hazardous machinery or moving mechanical parts and that Claimant reported few side effects from his seizure medication. (ECF No. 16 at 8–15.)

A. *VE Testimony*

Claimant first asserts that the ALJ erroneously relied on the VE's testimony in making his step-five findings because two of the jobs she identified—those of assembler and packing line worker—involve exposure to hazardous machinery and moving mechanical parts, which Claimant's RFC prohibits. (ECF No. 15 at 2–4.) "When, as in this case, an ALJ determines that a claimant's RFC prevents the claimant from performing [his] past work, the ALJ reaches step five of the [sequential evaluation] process," and "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the

14

claimant is capable of doing other work that exists in significant supply in the national economy." *Thomas v. Berryhill*, 916 F.3d 307, 313 (4th Cir. 2019). Generally, to meet this burden, "the Commissioner calls a VE to testify to whether a hypothetical person with the same limitations as the claimant would be able to perform any of the jobs listed in the [*Dictionary of Occupational Titles*]." *Id.* (citing *Mascio v. Colvin*, 780 F.3d 632, 635 (4th Cir. 2015); SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)).

Before relying on the VE's testimony, the ALJ must ask her if her testimony conflicts with the *Dictionary of Occupational Titles* and solicit an explanation if she answers that it does. *Pearson v. Colvin*, 810 F.3d 204, 208 (4th Cir. 2015) (quoting SSR 00-4p, 2000 WL 1898704, at *4). Claimant and the Commissioner appear to agree that the ALJ improperly failed to ask the VE during the hearing whether her testimony was consistent with the *Dictionary*. (ECF No. 15 at 2; ECF No. 16 at 8.) However, the Commissioner argues that the error was harmless because there is no conflict between the VE's testimony and the *Dictionary*, since the assembler and packing line worker jobs do not require working around hazardous machinery or moving mechanical parts. (ECF No. 16 at 8–9.) Indeed, the *Dictionary* specifies that neither position involves exposure to moving mechanical parts, electric shock, heights, radiation, explosives, or toxic, caustic chemicals. U.S. Dep't of Labor, Dictionary of Occupational Titles 929.587-010, 1991 WL 688159 (assembler); *id.* 753.687-038, 1991 WL 680354 (packing line worker). The ALJ therefore correctly determined that the VE's testimony was consistent with the *Dictionary of Occupational Titles*. (Tr. at 43.) *Pearson*, 810 F.3d at 209 (stating that ALJ must "independently . . . identify conflicts between the [VE's] testimony and the *Dictionary*" by "compar[ing] the express language of the *Dictionary* and the [VE's] testimony"). The undersigned **FINDS** that his failure to expressly ask the VE about any

conflicts between her testimony and the *Dictionary* during the hearing did not prejudice Claimant. *See Keaton v. Colvin*, No. 3:15-cv-00588, 2017 WL 875477, at *4 (E.D. Va. Mar. 3, 2017) ("In order to merit remand or reversal, an ALJ's error must cause harm and not just a possibility of prejudice." (footnote and internal citations omitted)).

Claimant's assertion that the jobs the VE identified are not available in significant numbers is likewise meritless. (ECF No. 15 at 4–5.) "[I]dentification of even one occupation appropriate for Claimant fulfills the Commissioner's burden at the fifth step of the [sequential evaluation] process, so long as the occupation is available in significant numbers in the economy." *Kennerly v. Colvin*, No. 2:15-cv-01540, 2015 WL 9672913, at *13 (S.D.W. Va. Dec. 8, 2015) (citing 20 C.F.R. §§ 404.1566, 416.966), *adopted by* 2016 WL 93867 (S.D.W. Va. Jan. 7, 2016). The ALJ determined, based on the VE's testimony, that Claimant could work as an assembler, with 1,000 jobs available regionally and 38,000 nationally; a packing line worker, with 900 jobs available regionally and 36,000 nationally; or a garment folder, with 1,100 jobs available regionally and 34,000 nationally. (Tr. at 43.) A position with as few as 110 jobs in the regional economy has been found to be sufficient to satisfy the Commissioner's step-five burden. *Hicks v. Califano*, 600 F.2d 1048, 1051 n.2 (4th Cir. 1979). As such, even assuming the occupational base should be further eroded, as Claimant asserts without support (ECF No. 15 at 4–5), reversal would still be unwarranted because the Commissioner would have satisfied his step-five burden. The undersigned **FINDS** that the ALJ committed no error by relying on the numbers the VE provided.

### B. *Medication Side Effects*

Claimant contends that the ALJ erred by not considering the side effects from his seizure medications, particularly with regard to the increase in the dosage from 1,000

16

milligrams per day to 3,000 milligrams per day "in less than a two year time period." (ECF No. 15 at 7.) As part of the RFC assessment, the ALJ must evaluate a claimant's "statements and symptoms regarding the limitations caused by her impairments." *Linares v. Colvin*, No. 5:14-cv-00120, 2015 WL 4389533, at *5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 593–96 (4th Cir. 1996)). To evaluate the disabling effect of an individual's symptoms, the ALJ first determines whether "objective medical evidence" supports the existence of "a condition reasonably likely to cause the [symptoms] claimed." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); *see* 20 C.F.R. § 404.1529(c)(1). If so, the ALJ then "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to "determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). An individual's subjective complaints about his symptoms, including any side effects of his medication, are relevant to the latter determination. *See id*. § 404.1529(c)(3). The ALJ is obligated to "assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Vass v. Berryhill*, No. 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018).

The Commissioner correctly points out that Claimant routinely reported to his primary care physician and his neurologist that his medications did not cause any side effects. (ECF No. 16 at 12–13.) In his review of the medical evidence of record, the ALJ acknowledged that Claimant told his neurologist at his October 6, 2016 appointment that his "prescribed medications caused fatigue, balance issues, and daytime sleepiness" but reported at his March 1, 2017 visit that he had "adjusted [to his] prescribed seizure medications well." (Tr. at 38–39.) The ALJ also noted that physical examination and mental status examination findings throughout the record were generally normal. (*Id.* at

37–39.) He mentioned Claimant's hearing testimony "that he is heavily medicated and has difficulty with cognition, concentration, and response," but he ultimately determined that these statements were not supported by the record because Claimant "reported a variety of regular daily activities" and "cited good capacity for following written instructions, sustaining attention, completing tasks, and adapting to stressors." (*Id.* at 37, 40.) Put simply, whatever Claimant's counsel believes about the possible side effects associated with Claimant's seizure medications, the ALJ concluded that the record reflects that Claimant did not experience those side effects to a disabling degree. The undersigned **FINDS** that the ALJ's evaluation of Claimant's subjective statements about the side effects of his medications is supported by substantial evidence.

      Claimant's argument that the ALJ's RFC assessment in this case should have been more restrictive than that in his prior claim for benefits because of the increased medication dosage fails for the same reason. The ALJ must consider the evidentiary value of any administrative findings on a prior claim by determining whether there has been a change with the passage of time and whether new evidence merits a different result. *See Cuffee v. Berryhill*, 680 F. App'x 156, 159 (4th Cir. 2017). Here, the ALJ explained that he "finds the prior decision . . . persuasive" because it "was issued a short time before [Claimant] filed this application for benefits, and evidence not considered in the prior decision does not show a significant change in [his] health and functional ability." (Tr. at 41.) To that end, he noted that Claimant's "seizures are controlled with prescribed treatment and medications." (*Id.*)

      Claimant puzzlingly suggests that unlike the RFC assessment in the prior decision, the ALJ's RFC assessment in this case prohibits any exposure to hazardous machinery and moving mechanical parts and operation of a motor vehicle. (ECF No. 15 at 7–8.)

18

However, the RFC assessments in both cases preclude Claimant from working around moving mechanical parts and operating a motor vehicle, so only the restriction for hazardous machinery is new. (Tr. at 36, 112.) In that manner, the RFC assessment in this case appears to be more favorable to Claimant than the RFC assessment in the prior decision. He nevertheless asserts—without citing any record evidence—that his condition has worsened since the prior decision because the increased dosage of his medication "affects [his] concentration, pace and alertness, which would also affect his ability to perform a task on a timely basis." (ECF No. 15 at 7–8.) But the ALJ, in appropriately discounting Claimant's subjective complaints about the side effects of his medications, effectively determined that this was not the case. Accordingly, the undersigned **FINDS** that the ALJ properly considered the unfavorable decision on Claimant's previous claim for benefits.

### *IV.  CONCLUSION*

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 15), **GRANT** the Commissioner's request to affirm his decision (ECF No. 16), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Frank W. Volk, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and

Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Volk.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: March 11, 2021

Dwane L. Tinsley
United States Magistrate Judge